1

```
                 UNITED STATES DISTRICT COURT
```

2
```
                  SOUTHERN DISTRICT OF OHIO
                       WESTERN DIVISION
                          - - -
```

3
```
UNITED STATES OF AMERICA,      .  Case Number 1:20-cr-74
                               .
```

4
```
               Plaintiff,      .
                               .  Status Conference
```

5
```
          - v -                .
                               .
```

6
```
DARIAS JACKSON, et al.,        .  Monday, May 16, 2022
                               .  1:40 p.m.
```

7
```
               Defendants.     .  Cincinnati, Ohio
    . . . . . . . . . . . . .
```

8

```
                     TRANSCRIPT OF PROCEEDINGS
```

9
```
     BEFORE THE HONORABLE MICHAEL R. BARRETT, SENIOR JUDGE
```

10
```
APPEARANCES:
```

11
```
For the Plaintiff:
```

12
```
KELLY K. ROSSI, ESQ.
JULIE D. GARCIA, ESQ.
```

13
```
United States Attorney's Office
221 East Fourth Street, Suite 400
```

14
```
Cincinnati, Ohio  45202
```

15
```
For the Defendant, Darias Jackson:
```

16
```
RAVERT J. CLARK, ESQ.        JODIE DREES GANOTE, ESQ.
114 East Eighth Street       215 East Ninth Street
```

17
```
Cincinnati, Ohio  45202      Cincinnati, Ohio  45202
```

18
```
For the Defendant, Jessica Brown:
```

19
```
ZENAIDA R. LOCKARD, ESQ.
Federal Public Defender's Office
```

20
```
200 East Fifth Street, Suite 350
Cincinnati, Ohio  45202
```

21

```
For the Defendant, Gregory Jackson:
```

22

```
STEPHANIE KESSLER, ESQ.
```

23
```
455 Delta Avenue, Suite 105
Cincinnati, Ohio 45226
```

24
```
Law Clerk:          Lindsay Littleton, Esq.
```

25
```
Courtroom Deputy:   Krista Zeller
Court Reporter:     Maryann T. Maffia, RDR
```

```
 1                      P R O C E E D I N G S
 2         (Before the Court at 1:40 p.m.  All defendants present.)
 3             COURTROOM DEPUTY:  Before the Court is District Court
 4    Case 1:20-cr-074:  United States of America versus Darias
 5    Jackson, et al.
 6         We are here today for an in-person status conference.
 7             THE COURT:  Okay.  Counsel want enter their
 8    appearances for the record, please.
 9             MS. GARCIA:  Good afternoon, Your Honor.  Julie
10    Garcia and --
11             THE COURT:  Julie, you don't have to stand.  If
12    you're going to stand, it just makes it hard to get to the
13    microphone.
14             MS. GARCIA:  Thank you, Your Honor.  Julie Garcia and
15    Kelly Rossi for the United States.
16             THE COURT:  Okay.
17             MR. CLARK:  Jay Clark for Darias Jackson.
18             Ms. GANOTE:  Jodie Drees Ganote for Darias Jackson.
19             MS. LOCKARD:  Zenaida Lockard for Jessica Brown.
20             MS. KESSLER:  And Stephanie Kessler for Gregory
21    Jackson.
22             THE COURT:  Okay.  And are your guys' clients in the
23    courtroom?
24             MS. LOCKARD:  Miss Brown is seated in the second row.
25             MS. KESSLER:  And Greg Jackson is seated in the
```

1 second row next to Mr. Pinales.

2 THE COURT: Okay. All right. I'm not sure what

3 order you guys want to take it in, but I think last time when

4 we were on the phone we first had a conversation about the

5 continuance issue as it related to either the government

6 getting information off the phone in close proximity to trial

7 or you guys getting an independent -- requesting an

8 independent forensic examiner.

9 So I think what I suggested in the informal call was that

10 the government talk about a cut-off date where either they

11 think they have it or they don't have it, and then we can talk

12 to you guys about what you want to do.

13 So Julie, do you have any thoughts about that?

14 MS. GARCIA: Your Honor, the government is not ready

15 to commit to a cut-off date given that we are working

16 adamantly to get into the phone. However, we are open to the

17 defense's idea of potentially allowing them to do their own

18 forensic extraction of the device under agreed circumstances.

19 And what the government would propose is that the defense

20 file a motion setting out who they intend to have take a look

21 at the phone, what tools that person would use, and what

22 procedures they propose putting into place so that the parties

23 can both feel assured that the end result is something that

24 can be trusted and has not been tampered with.

25 I will say that the government spoke with the ATF agent

1    who handled taking this phone and giving it to the ATF Digital

2    Forensics branch.  That agent checked with the Digital

3    Forensics branch and also with other federal agencies,

4    including the FBI, to see whether they were aware of any

5    forensics tools that are available either to law enforcement

6    or publicly that would have a better chance of getting into

7    this phone.  That ATF agent was informed that no, so far as

8    the FBI and ATF are aware, there -- and HSI as well, pardon

9    me -- there are no other forensics tools out there that would

10    have a better chance of getting into the phone.  However,

11    we're to open to hearing what the defense would propose, and

12    then we'd just ask for a chance to respond to be able to

13    explain why or why not the proposed course of action might

14    make sense in this case.

15          THE COURT:  But if they don't want that, I -- I don't

16    want you guys to do a discovery drop the week before trial

17    necessitating another continuance, if that's -- so I want to

18    know at some point you're either going to use the phone or

19    you're not.  So you guys -- I'm not going to pin you down

20    right this second, but I want you to think about that.

21    Have you guys had a chance to caucus amongst yourselves

22    and have any thoughts on whether or not you want to file a

23    motion for an independent examination?

24          MS. LOCKARD:  Your Honor, we have discussed this

25    amongst ourselves, as well as with our clients, and we would

1  like to file a motion for an independent examination. I'm not

2  -- we would have to reach out to the specific locations and

3  find out their procedures and what, perhaps, technology. If

4  the government is suggesting that we should include that in

5  the motion, we're happy to do that. I don't have the

6  information today, but it is something that if the government

7  is unable to get into the phone, we would like to make efforts

8  to see if our experts could do so.

9       THE COURT: But that's where the Catch 22 is. So you

10 want to wait to see if they get into the phone or not, right?

11      MS. LOCKARD: Your Honor, we would actually request

12 perhaps a date, what you had suggested, a date whereby they're

13 either in it or they're not. And if they're not in it by that

14 date, then we would get to have -- transfer that phone to the

15 custody of our experts so that they can begin their own

16 examination. And, obviously, we can ask them for a projected

17 timeline of how long they would expect it to take.

18      THE COURT: You would ask your expert for that, yes.

19      MS. LOCKARD: Yes. I mean, I think the government

20 has been attempting for approximately a year. I could be

21 wrong on that timeline, but they have been trying for some

22 time to get into the phone. And based on our theory of

23 defense and our discussions with our clients, we would like

24 the opportunity to do so as well if they are unsuccessful.

25      MS. GARCIA: Your Honor, on that point we are willing

1   to commit to a date by which we would give to it to the

2   defense for them to attempt an extraction if we come up with a

3   reason to believe that their proposed extraction would have

4   better luck. So right now it's true that -- the phone is just

5   -- the software is just cycling through potential passwords,

6   and that could take decades. What we are trying to do is come

7   up with a list of potential passwords based on what we know

8   about the victim and potentially be able to give the Digital

9   Forensics branch some ideas about combinations of letters and

10   numbers that might expedite the process of getting in, but we

11   fully acknowledge that this could take a very, very long time.

12      So, for that reason, we are open to saying something like

13   if we're not able to get into it in the next three or four

14   weeks, and if the defense proposes procedures that --

15         THE COURT: Well, let's pick a time now. So how much

16   time are you -- I mean, when are you willing to serve up the

17   phone?

18         MS. GARCIA: Four weeks from today would be fine,

19   Your Honor.

20         THE COURT: So that puts it where, mid-June?

21         MS. GARCIA: I think that's right, Your Honor, yes.

22   June 16th, is that --

23         THE COURT: So if they get the phone on June 16th,

24   though, I find it hard to believe that they'll have a report

25   in, you know, two or three weeks when you guys have had it for

1    months.

2         MS. GARCIA:  Right.  So I will say that we are

3    skeptical that we will even reach the point where we're giving

4    the phone to the defense because we're skeptical that they

5    will be able to propose a procedure and, you know, attempt --

6    software that would be anything better than what the FBI and

7    the DEA and the ATF have.

8         THE COURT:  Well, there's a lot of people out there

9    that do this kind of stuff, so -- but, I mean, it's not going

10   to be ready by trial.  If you don't give it to them until the

11   middle of June, there's no way that somebody is going to have

12   anything back, I don't think, by --

13      What's our trial date, July 7th or something, somewhere in

14   there?

15         LAW CLERK:  It's the 11th --

16         MR. CLARK:  June 11th.  July 11th.

17         THE COURT:  I just don't see that happening.

18         MS. LOCKARD:  Your Honor, I would note for the record

19   that we have consulted with all of our clients, and we are

20   requesting a continuance for this precise purpose.  Our

21   clients are willing to waive Speedy Trial and sign waivers to

22   that effect to a new date for a trial date.  It is that

23   important to us that we be given this opportunity to examine

24   the phone ourselves.  And so the reason that we filed the

25   Motion to Continue is because we wanted to alert the Court to

1   this issue and also put the Court on notice that we are asking

2   for a continuance of the trial date at this point in time.

3           THE COURT:  Okay.  I thought when we had the

4   conversation before you guys weren't sure as to where you were

5   on the forensics.  Now you've agreed you do want it, so that

6   makes it -- okay.

7       Thoughts?

8           MS. GARCIA:  Just to be clear, I didn't actually see

9   a Motion to Continue come through.  Has that already been

10  filed?

11          THE COURT:  Yeah.  It was part of -- Doc. 155 was a

12  motion on raising the forensic issue and asking for a

13  continuance, I believe.

14          MS. GARCIA:  I apologize, Your Honor.  I missed that.

15          THE COURT:  And I left it upstairs.

16      Lindsay, do you mind doing me a favor?  I think I left the

17  stuff right on the corner of my desk.

18          LAW CLERK:  Okay.

19          THE COURT:  I'm sorry.

20      Wasn't that what it was, guys, Doc. 155?

21          MS. LOCKARD:  Yes, Your Honor.  We did file a Motion

22  to Continue.

23          THE COURT:  Thoughts?

24          MS. GARCIA:  Yes, Your Honor, that was our

25  understanding from the last status conference, that it was the

1 defense's intention to push the trial date to give them time

2 to try to get into the phone. So we're open to the idea that

3 the government will give it one last try with trying to come

4 up with a list of potential passwords to get into the phone,

5 and that if we're not able to and if we can come up with

6 agreed procedures that everyone feels comfortable with, we are

7 willing to allow them to attempt to get into the phone.

8        THE COURT: So you don't object to their request for

9 a continuance at this time?

10 (Ms. Garcia and Ms. Rossi confer privately.)

11        MS. GARCIA: So, Your Honor, the government's

12 position on a motion for a continuance depends in part on

13 whether the defendants are able to propose circumstances and

14 conditions under which it seems likely that they would be able

15 to get into the phone. So if they're going to be proposing

16 using software that has already been used without success,

17 then we would say, well, no, you shouldn't even get to try

18 that again and --

19        THE COURT: How am I going to figure that out?

20        MS. GARCIA: If they file a motion and say here's

21 what we propose using, here's our person who is going to do

22 it, they're going to use Cellebrite technology, we would say

23 we've already done that and it didn't work.

24        THE COURT: As long as they propose somebody that has

25 some qualifications and we have safeguards in place that

1    what's on the phone is not destroyed in the extraction and

2    that what is extracted in its entirety is shared with both

3    sides, I don't care what system they use.  I'm not going to

4    let you guys say, well, that didn't work for us, it's not

5    going to work for them.  How do I know?

6        MS. GARCIA:  That's a fair point, Your Honor.  Given

7    the defense -- I understand why they would want to get into

8    the phone, and the government wants to get into the phone as

9    well, so at this point we would not object to a continuance to

10   allow them to try to do so.

11       THE COURT:  Thank you, Lindsay.

12       MR. CLARK:  Can I offer a suggestion, Your Honor?

13       THE COURT:  Oh, sure.  Why not, Jay.

14       MR. CLARK:  Well, I'm in the back for a reason.

15       THE COURT:  Go ahead.

16       MR. CLARK:  So since the phone is allegedly the

17   property of the alleged victim, maybe we could set a hearing

18   in a couple of weeks and the government can bring the victim

19   in and he can give them the password for the phone.

20       THE COURT:  Thank you for your help, Jay.

21       MR. CLARK:  Just throwing that out there.

22       THE COURT:  Okay, that's good.

23   So what are you guys thinking?

24       MS. LOCKARD:  Your Honor, I think it would make sense

25   to reset the trial date to a date certain.  We can have our

1    clients execute waivers since they are present in court with

2    us today.  And then if the government -- you know, if they

3    propose the June -- I missed the date, but if it's

4    approximately a month from now, then we can reach out to our

5    contact person and find out how long they need.

6        In my experience when we've had phones looked at, it can

7    take several weeks for them to do their own independent

8    investigation.  So I would suggest at least giving us maybe at

9    least two months to start.  Then if we needed additional time,

10   we could file another Motion to Continue.

11           THE COURT:  Well, off the top of my head, with our

12   schedule I think we couldn't do anything until the very end of

13   October anyway.

14           MS. LOCKARD:  That would be --

15           THE COURT:  Krista, do you want to look at, like --

16           COURTROOM DEPUTY:  Well, I think it would actually

17   have to be the beginning of -- so we currently have a trial

18   scheduled to start on October 24th, and then we have a short

19   trial that next week, so I don't think it would be actually

20   until --

21           THE COURT:  What's the 24th?

22           COURTROOM DEPUTY:  It's that *Veerkamp*, I believe that

23   child pornography.

24           THE COURT:  That's yours, isn't it, Ashley?  Is that

25   going to go?

```
 1              MS. WEINHOLD:  Yes.

 2              THE COURT:  That's going to go.

 3         Well, let's go to -- what did you say?

 4              COURTROOM DEPUTY:  Well, we have a two-day trial the

 5    first week of November.  That's a civil case.  It's a bench

 6    trial.  Probably can move that or --

 7              THE COURT:  Which one is that?  We might have bounced

 8    them around before.

 9              COURTROOM DEPUTY:  Oppenheimer versus City of

10    Madeira.

11              THE COURT:  Oh, yeah.  No, that's a mess.

12              COURTROOM DEPUTY:  We can do it --

13              THE COURT:  Actually, I will bounce that, come to

14    think of it.

15              MS. GARCIA:  Pardon me, Your Honor.  Did you say that

16    it would not be possible to do the trial toward the beginning

17    of October?

18              THE COURT:  It's not.

19              COURTROOM DEPUTY:  So we could start the 31st of

20    October and then go into --

21         Did you say it would be ten days, into the following week?

22              THE COURT:  Okay.

23              MS. LOCKARD:  Your Honor, that would be fine with the

24    defense.  Thank you.  Mr. Clark had suggested that we perhaps

25    leave -- if you want to leave maybe a status conference on
```

1    July 11th, we could at least give the Court a better

2    understanding of what our experts are saying at that time.

3           THE COURT:  Oh, I'm sure we will have numerous

4    communications.  We'll just leave something on the docket that

5    date.  Okay.  So let's do time waivers for that date and get

6    that accomplished right now.

7           MR. CLARK:  October 31st?

8           THE COURT:  Do you guys have forms?

9        Krista, do you have --

10          COURTROOM DEPUTY:  Yes.

11          THE COURT:  We've got some forms.

12       Do either of you two guys need to talk to Greg or Jessica

13   out in the back room to go over this?  Are you guys all good?

14          MR. CLARK:  With Darias, I'm good.

15          MS. KESSLER:  I'm good, Your Honor.

16          MS. LOCKARD:  We're good, Your Honor.

17          THE COURT:  All right.  So let's get the forms out.

18   (Pause in proceedings.)

19          THE COURT:  Jay, you make that for yours from today's

20   date to them so you're not waiving any prior arguments -- or

21   actually from the time the motion was filed.  I don't know

22   when Document 155 was filed --

23          MS. LOCKARD:  We filed the Motion to Continue on May

24   5th.

25          THE COURT:  May 5th.  Okay.  One of you guys just

1    want to hand all of them up?

2              MR. CLARK:  Do you want them to you, Judge?

3              THE COURT:  Yeah, just hand them all up.  Thank you.

4         So Darias, I'll start with you since you're in custody.

5    You're aware that your lawyers had this conversation about

6    having the phone forensically examined.  They've asked for

7    time to do that.  You've heard the conversations back and

8    forth between the United States on the sense of timing on

9    this.  So your side of the fence, the defendants have asked

10   for a continuance from the filing date of the Motion to

11   Continue, May 5th, to October 31st for a trial.

12        You have previously implicated certain rights under the

13   Speedy Trial Act.  I would believe -- I'm not the final say on

14   this, but those would not be given up by this specific

15   continuance which would go from the filing of the motion to

16   October 31st.  All right?  Are you okay with that?

17             DEFENDANT DARIAS JACKSON:  Yes.

18             THE COURT:  Okay.  So what you're doing here -- I saw

19   you sign this.  This appears to be your signature.  Did you

20   sign it?

21             DEFENDANT DARIAS JACKSON:  Yes.

22             THE COURT:  And are you requesting a continuance from

23   the filing date of the Motion to Continue until the new trial

24   date we intend to set on October 31st, 2022?

25             DEFENDANT DARIAS JACKSON:  Yes.

1          THE COURT:  And by doing that, you are waiving any

2    rights you would have from that period of time under the

3    Speedy Trial Act, 18 U.S.C. 3161(c)(1); is that correct?

4          DEFENDANT DARIAS JACKSON:  Yes.

5          THE COURT:  And Jay, have you fully advised your

6    client of the premises, and do you agree that that is his

7    intended decision in this case?

8          MR. CLARK:  Yes, sir, I have, and I do.

9          THE COURT:  Okay.  All right.

10       So Jessica, you've heard the conversation, correct?

11         DEFENDANT BROWN:  Yes.

12         THE COURT:  Okay.  You've also heard me go over

13   Darias's situation.  Under the Speedy Trial Act, you have

14   certain rights under 18 U.S.C. 3161(c)(1) to have the case

15   determined within a certain amount of days.  Certain things

16   can extend that period of time such as the filing of

17   dispositive motions, things like that, as well as this type of

18   a motion, which is a motion for a continuance.

19       Are you willing to waive time from the filing date of May

20   5th, 2022, to October 31st, 2022?

21         DEFENDANT BROWN:  Yes.

22         THE COURT:  Okay.  And I actually didn't see you sign

23   this, so I'll just ask you, Jessica:  Is this your signature

24   on this?

25         DEFENDANT BROWN:  Yes.

1          THE COURT:  All right.

2      Zenaida, do you think that you have fully informed Jessica

3  of the premises and do you think she's knowingly,

4  intentionally, and voluntarily, as Darias did, waiving her

5  right to Speedy Trial for that period of time?

6          MS. LOCKARD:  Yes, Your Honor.

7          THE COURT:  Okay.

8      Where's Greg?  Greg's there.  Okay.

9      Greg, you've heard the conversations I've had with Darias

10  and Jessica?

11          DEFENDANT GREGORY JACKSON:  Yes.

12          THE COURT:  And you likewise have tendered a Waiver

13  of Speedy Trial and agreement to the new trial date of October

14  31st, 2022.  By agreeing to this, you're waiving your rights

15  to any defenses under the Speedy Trial Act, 18 U.S.C.

16  3161(c)(1), from the filing date until the trial, the new

17  scheduled trial date of October 31st.  Are you okay with that?

18          DEFENDANT GREGORY JACKSON:  Yes.

19          THE COURT:  Okay.  And I also did not see you sign

20  this.  Is that your signature on the bottom of the page?

21          DEFENDANT GREGORY JACKSON:  Yes.

22          THE COURT:  All right.

23      Stephanie, do you think you have fully informed Greg of

24  the premises of this case, and do you think this is his

25  knowing, intelligent, and voluntary request to waive time

1    during the period of time from the filing of the motion until

2    the trial date?

3        MS. KESSLER:  I have, and I do, Your Honor.

4        THE COURT:  Okay.

5    So on the record I find that all three individuals have

6    knowingly, intentionally, and voluntarily waived their rights

7    to exercise any Speedy Trial issues from the period of time of

8    the filing of the Motion to Continue on May 5th until the new

9    trial date of October 31st, 2022.

10   Anything else on that, guys?

11       MS. GARCIA:  No.  Thank you, Your Honor.

12       MS. LOCKARD:  No, Your Honor.

13       THE COURT:  All right.  I think the next thing we had

14   -- I'm not sure this becomes quite the pressing issue it was

15   half-an-hour ago, but you guys had talked about possibly

16   having extended deadlines to file motions in this case.  Where

17   do we stand on that?  And I want to talk about where the

18   discovery stands because I wasn't quite clear, based upon on

19   our informal conversation, what was going on.

20   My understanding was I thought the government said it

21   produced everything that was retrieved from the warrant.  You

22   guys said you hadn't gotten the returns yet or had just gotten

23   them, something like that.  I wasn't sure exactly where we

24   stood.

25   So before we talk about how much time we would need to

1  file Motions to Suppress, where do we stand on the exchange of

2  information?

3         MS. GARCIA:  I can answer that question, Your Honor,

4  if you would like.

5         THE COURT:  Okay.

6         MS. GARCIA:  The government has produced all of the

7  actual substance of the search warrants that we got in this

8  case --

9    There are a little over 40 search warrants.

10   -- with two exceptions that the government just found out

11 about, and we're going to produce this week.  Those ones -- so

12 I guess I'll first describe the ones we already produced.

13   So there are several search warrants relating to phone

14 records, e-mail accounts, social media accounts, and so on.

15 The vast majority of those results were produced back in

16 either 2020 or 2021.

17         THE COURT:  You're talking about the data that was

18 actually mined as a result?

19         MS. GARCIA:  The data that's actually mined as a

20 result.  So yes, it is true that in this case a lot of the

21 returns, the actual form describing the data that came back,

22 those were not filed until relatively recently just due to an

23 oversight, but the actual underlying data was produced.  Now,

24 there is a subset of those search warrants that were not

25 produced originally, and those related to either the victim's

1  private information or an ongoing investigation of an

2  unindicted co-conspirator, Mr. Jearid Irvin.

3      The reason those were not produced earlier is:  A, the

4  government didn't intend to use any of the evidence that had

5  been gotten from those search warrants; B, none of it was

6  relevant and exculpatory; C, none of the defendants had

7  standing to challenge any of the data that we got from those

8  search warrants anyway.

9      The reason that we recently produced those, and at this

10 point I guess it's about six weeks ago, is that in preparing

11 our response to the Motion to Dismiss which set out the very

12 inaccurate description of the ongoing investigation and the

13 extent to which the government was continuing to investigate

14 the full scope of the conspiracy to tamper with witnesses, we

15 felt that it was important to set out for the Court the full

16 scope of all the search warrants that we had gotten in this

17 case to demonstrate that the investigation was still ongoing.

18 And because Mr. Irvin died earlier this year, there was no

19 ongoing investigation that would lead to a charge against him,

20 at least.  So we felt that it was, on balance, okay to go

21 ahead and produce those searches warrants to the defense.  So

22 we did produce those things and, as I mentioned, they are not

23 relevant or exculpatory.  And I can go into a little more

24 detail about why if the Court would like.

25          THE COURT:  Well, if it's produced, they can figure

```
 1   out if it's exculpatory or not.

 2           MS. GARCIA:  Exactly.

 3           THE COURT:  Is there anything left to produce then?

 4   That's the real question.

 5           MS. GARCIA:  Yes.  So there's one more category.  The

 6   government, in the past week or so, we've been going through

 7   just to make absolutely certain that we produced everything.

 8   One we thought we had produced, and that's the results of an

 9   iCloud search warrant for an account under the name of the

10   victim plus his last -- plus the last two years of his birth

11   year.  I don't want to say it on the public record.

12           THE COURT:  That's fine.

13           MS. GARCIA:  We thought we had produced those

14   results.  I realized that we actually produced the results of

15   the subpoena for that account, and the results for the search

16   warrant for that account inadvertently were not included.  So

17   we found those results and are preparing them for production.

18   Actually, the results are in kind of a raw format that the

19   agent is working as we speak to run them through software

20   called AXIOM to make it easier to review the results.  They

21   come in a really inconvenient format with sub-folders.  He

22   anticipates that would be done this week.  We'll produce

23   those.

24       The second one that we did not produce, we actually didn't

25   realize that we had even gotten any returns from it.  We were
```

1    under the impression, because this happened during the

2    pandemic and there was a lot of confusion with people out of

3    the office, we didn't realize that we'd ever gotten any

4    results for a second iCloud account under the name Sylvester

5    Scarlato.  We did find those results as well when we were

6    looking through this iCloud stuff.  So we'll produce that at

7    the same time and also with the AXIOM formatting to make it

8    easier to review.  We haven't looked at the results of these

9    ourselves, so I can't say exactly what is in either of those.

10            THE COURT:  Give me a cut-off date for when all this

11   will be completed.

12            MS. GARCIA:  The end of the week.

13            THE COURT:  Okay.

14            MS. GARCIA:  End of the week.  And then the only

15   other one, which I don't think they're entitled to but we just

16   wanted to make sure everything in our file essentially is

17   turned over to avoid any issues going forward, is we did get

18   an additional search warrant for the victim's updated medical

19   records.  We'll produce those as Attorneys' Eyes Only.  I

20   don't think it's actually relevant to what happened three

21   years ago, but we'll produce that as well.

22            THE COURT:  Okay.  So if this stuff is going to be in

23   your guys' possession by the end of the week or early next

24   week, what do you think for a motion-filing cutoff?

25            MS. LOCKARD:  Your Honor, we would suggest 45 days.

 1          THE COURT:  So where is -- what is that, the end of

 2  June?

 3          MR. CLARK:  Roughly the first of July.

 4          THE COURT:  June 30th, does that work?

 5          MS. GARCIA:  That's fine with the government, Your

 6  Honor.

 7          THE COURT:  Okay.  So motion-filing deadline is June

 8  30th.

 9      The next thing I had was 145 and 148.  These were -- I

10  think these were the Motions to Amend the protective order as

11  it relates to grand jury testimony; is that right?

12          MS. LOCKARD:  We did file that, Your Honor, yes.

13          THE COURT:  Is that yours, Zenaida?

14          MS. LOCKARD:  Yes, Your Honor.

15          THE COURT:  So tell me what's going on here.

16          MS. LOCKARD:  I don't know if that is now a moot

17  issue.  We have signed a Joint Defense Agreement among all of

18  the parties, and so I think at this point we could certainly,

19  under the terms of that Agreement, share that with the -- Miss

20  Kessler, I believe, is the only person who didn't have access

21  to that grand jury transcript.

22      But I want to make absolutely certain because, you know,

23  under the current terms of the protective order we are not

24  permitted to share that specific discovery with Miss Kessler

25  and her client.  And so that is the reason that we made that

1    request.  We filed, I think, a supplemental sealed argument to

2    our Motion to Dismiss that related to that transcript

3    testimony, but I will defer to the Court if the Joint Defense

4    Agreement covers it or if we actually need to amend the

5    protective order so that we can disclose that information to

6    Miss Kessler and her client.

7            MS. GARCIA:  Your Honor, it's the government's

8    position that a Joint Defense Agreement would not be

9    sufficient to allow the defense to share grand jury materials

10   without the government's consent under Rule 6(e).  However,

11   after further consideration, we will agree to produce the

12   grand jury transcript of Miss Brown's testimony to Greg, the

13   only remaining defendant who doesn't have it, because it may

14   be relevant to the charged conspiracy.

15       So Miss Lockard is right that, for present purposes, it is

16   a moot point.

17            THE COURT:  Okay.  All right.  Fair enough.

18       Let's see.  Then we have a motion on prosecutorial

19   misconduct.  Are there any other lesser motions floating

20   around besides that?

21            MS. LOCKARD:  No.

22            THE COURT:  Okay.  So this is not a hearing on the

23   motion for prosecutorial misconduct.  This is a hearing today

24   on whether you get an evidentiary hearing.  Okay?  So as I

25   understand it, you have to show the exercise of protected

1  right, a statutory or constitutional right has been abridged,

2  the prosecutor has a stake, and the conduct was unreasonable.

3     So you guys want to argue for an evidentiary hearing?  How

4  do you want to do this?  Do you want to break it up?  Does one

5  person want to cover it?

6        MS. LOCKARD:  Your Honor --

7        THE COURT:  Because I make up my mind about the

8  hearing based upon what's been filed and what you say today,

9  right?

10       MS. LOCKARD:  Correct, Your Honor.

11       THE COURT:  Okay.

12       MS. LOCKARD:  I mean, I think we have laid out the

13  test, and Your Honor just correctly summarized the test.

14  We've laid out our test in our Reply and the reason that we

15  feel we're entitled to this particular hearing.  The Court has

16  to find that the defendant exercised a protected right.  On

17  page 3 of the Reply, the protected right that we're talking

18  about here is Darias exercising his right to go to trial.  So

19  we are arguing that in response to him exercising his right to

20  go to trial, the government then engaged in conduct that's

21  related to their specific stakes.

22     In looking at the government's particular filing and its

23  argument, you know, they respond to our stakes by claiming

24  that they are not stakes in two pages based on my reading of

25  their response.  So they really focused that argument on pages

1    17, 18, and 19.  It's three pages.

2          THE COURT:  Wait, Zenaida.  Just summarize for me how

3    they are impinging on his right to go to trial.

4          MS. LOCKARD:  So what we have articulated is that the

5    government has a vested interest.  So when we think about a

6    stake, we're thinking about what's their particular interest.

7    And typically a prosecution's interest should be to seek

8    justice, whether that's a conviction or an acquittal or, you

9    know, a sentence under the guidelines as determined by the

10   Court.

11       In this particular case, we are arguing that the

12   government's stake is to make sure that they secure a win, so

13   they would like a conviction at trial, and not necessarily

14   they put up their case and if justice results in an acquittal,

15   that's what justice is.  But they're particularly interested

16   in securing a win.

17       And then the second stake would be --

18          THE COURT:  If they were doing that, wouldn't they

19   have offered less time?

20          MS. LOCKARD:  Well, that's where it gets into our

21   second stake.  So it's tied into the second stake because they

22   are seeking a particular sentence.  So if a win is not

23   sufficient, it's sort of like a cumulative -- if a win is not

24   sufficient, they also want a particular sentence.

25       And we know it's not just based on what we're arguing but

1     the government's own words alone. In our Reply, we indicated

2     that the government has said, and they said this in an e-mail

3     to all defense attorneys, that their, quote, "key objective is

4     to hold Darias Jackson responsible for the shooting the victim

5     nine times and permanently disabling him."

6         Additionally, the government wanted, quote, "a guarantee

7     of at least 15 years' imprisonment for Darias Jackson."

8         So when we're looking at particular stakes, those are what

9     we're arguing the government's interest are in this case.

10    They want to win and they want a specific sentence after

11    Mr. Jackson is convicted.

12        In terms of the unreasonableness, that's where you get

13    into the factual analysis that we have here, and we've

14    presented plenty of facts to support our position. We have

15    the JFS records, which we can certainly elaborate on if the

16    Court would like for us to do.

17           THE COURT: I mean, let's just run through a few

18    things. So I think -- didn't you argue that the Superseding

19    Indictments and the continuances were part of this, I guess

20    I'll call it, process for you guys? So tell me why that is

21    unusual to have a Superseding Indictment in a case when

22    information is still being gathered.

23           MS. LOCKARD: What we argued in this particular case

24    is the timing of the Superseding Indictments, and not

25    necessarily just the timing but the fact that they were adding

1    defendants in a way that circumvented the Speedy Trial clock.

2    So that, for us, falls under the third part of the analysis:

3    How was the conduct unreasonable?  So we have the exercise

4    right, we have the stake for the government's interest in the

5    outcome, and then we have how or what facts support that they

6    acted unreasonably.

7         So that's where we get into the JFS records, the manner in

8    which they superseded the case on the heels of what would have

9    been the trial date.  I think it's within a month of each

10   listed trial date they would supersede and add a defendant.

11        And as the Court is aware and the government just

12   articulated, you know, this is a case that involves over 40

13   search warrants.  So every time you add in a defendant, it's

14   going to take, I mean, quite a substantial amount of time to

15   get through all of that discovery.  So we argue that that was

16   gamesmanship for the clock or an unreasonable way in

17   prosecuting this case.

18        And then the third thing that we argued is the global plea

19   --

20             THE COURT:  Let me just flip that for a second.  The

21   fact that there are so many search warrants, doesn't that just

22   implicate the additional time the government needed to put the

23   package together?

24             MS. LOCKARD:  Well, in our review of the search

25   warrants thus far, Your Honor -- and there's 40 search

1　warrants and, from what we can tell, approximately 25 of those

2　returns were filed this year.  A number of those search

3　warrants, they're attempting to locate Antonio Williams, or

4　the victim in this case.  And so, you know, it's the defense

5　position, and this would be something that we would get into

6　at the hearing, that these search warrants weren't necessarily

7　sought and obtained in good faith or that the information that

8　they were actually seeking was locating this particular victim

9　and not actually the information that's contained within the

10　warrants themselves or what was produced in response to the

11　warrant.  So those are things that we would be asking to argue

12　in an evidentiary hearing or being able to test.

13　　　　　THE COURT:  Okay.

14　　　　　MS. LOCKARD:  And then the third argument that we

15　have is that the manner in which they have engaged in the

16　global plea offer is unreasonable.  And because they have

17　basically articulated -- and the Court already indicated, you

18　know, if all they were hoping was to secure a conviction and

19　not a specific sentence, then perhaps that conduct would have

20　been permissible.  But when you look at it in the context of

21　this larger case, what they're actually seeking is a

22　guaranteed sentence of 15 years for Mr. Jackson in exchange

23　for offering my client a misdemeanor and probation and Miss

24　Kessler's client a felony and probation.

25　　　　And so they tied all of those offers together in the hopes

1    that it would induce or coerce Mr. Jackson to plead guilty

2    here, whereas he has asserted his rights and his innocence

3    from the beginning of this case all the way dating back to

4    when this case originated as a supervised release violation.

5            THE COURT:  Somewhere along the line, I think -- I

6    thought I heard one of you guys say that the Plea Agreement

7    was higher than the guidelines calculation.  Is that correct?

8            MS. LOCKARD:  Your Honor, there is a dispute about

9    the guideline calculation as relates to Mr. Jackson and also

10   our clients.  The government is arguing that there should be a

11   cross-reference to a murder, and I think they've said that

12   they believe they would be able to prove first-degree murder,

13   but as part of their concessions in the plea negotiation they

14   are willing to do second-degree murder.

15       It's the defense position that it would be a felonious

16   assault cross-reference.  It does result in a disparity in the

17   guidelines of approximately -- I think it's double the

18   guideline calculation.

19       We have certainly gone to -- you know, when we had the

20   *Lafler* hearing, I had suggested that we have a phone

21   conference with the Sentencing Commission.  All of the parties

22   did that, including the government.  It was articulated during

23   that phone conversation that that would be a fact

24   determination that would need to be made by the Court.  So, in

25   other words, the Court would need to decide which

1    cross-reference applied based on the facts that are presented

2    to the Court.

3        And so Mr. Jackson offered -- and this was articulated by

4    Jay at the hearing.  Mr. Jackson offered to plead guilty to

5    the entire Indictment and just let the sentence be up to the

6    Court, and the Court could determine what the appropriate

7    guideline range is, in exchange for Miss Brown and Mr. Jackson

8    receiving the same benefits that the government were willing

9    to confer.  But the government was unwilling to do that and

10   articulated that the only way that they would confer those

11   same benefits upon my client and Miss Kessler's client was if

12   Mr. Jackson, in fact, agreed to a (C) plea that began with the

13   lowest number being 15 years.

14           THE COURT:  Okay.

15           MS. LOCKARD:  And so it's our position that that was

16   unreasonable, and that's because they are basically taking the

17   discretion of this Court to determine the appropriate sentence

18   out of the Court's hands.

19           THE COURT:  Okay.  Anything else then?

20           MS. LOCKARD:  No, Your Honor.

21           THE COURT:  Okay.

22       How about from your guys' side?

23           MS. GARCIA:  Your Honor, the defendants are not

24   entitled to an evidentiary hearing on their prosecutorial-

25   vindictiveness claim because it fails as a matter of law.

1      It's telling that in their motion they didn't cite any

2   Supreme Court or Sixth Circuit cases going to the issue of

3   alleged pretrial vindictiveness.  They only cited *Blackledge,*

4   which is about post-trial vindictiveness.  They didn't cite

5   *Bordenkircher* or *Goodwin* from the Supreme Court, which have

6   been settled law for decades.  They didn't cite *Howell* or

7   *Suarez* or *DeJohn,* the most recent of which is from 2021 from

8   the Sixth Circuit.  And then, after we pointed those out in

9   our Opp., the defense filed a Reply that still didn't address

10   any of those cases, and that is because those cases

11   categorically foreclose their argument as a matter of law.

12      We all agree on what the elements are.  The Court

13   articulated those.  Some cases tried them as two elements.

14   Some raise the same points into three elements.  We can go

15   ahead and go with the three elements that the Court

16   articulated.  Those are that the defendant exercised a

17   protected right, that the prosecutor had some stake in

18   deterring the exercise of that right, and that the

19   prosecutor's conduct was somehow unreasonable.

20      Now, they lose right out of the gate because they say that

21   the protected right Darias exercised was the right to trial.

22   That categorically cannot be the basis of a prosecutorial

23   vindictiveness claim.  You can take a look at the *DeJohn* case

24   that we cited which said that the claim is, quote,

25   "effectively foreclosed by the Supreme Court's decision in

1  *Bordenkircher versus Hayes*," and followed up by saying that

2  the Sixth Circuit, quote, "has consistently said so."

3      The *DeJohn* case denied a claim just like the defendants

4  are making in a single paragraph.  The defense criticizes our

5  brief for making this argument in two to three pages?  That

6  was honestly too long.  You can get rid of it in a paragraph

7  like the Sixth Circuit did.

8      You can also look at the *Suarez* case where they

9  specifically held that to show, quote, "the exercise of a

10 protected right," end quote, the defendant must, quote, "show

11 more than that he chose to assert his right to trial."

12     They don't cite these cases.  We raised them.  They don't

13 try to distinguish them.  It's over on the first element.

14 The case is done.  They lose.

15     But they also fail to make a *prima facie* showing on that

16 second element, the stake.  I thought it was interesting that

17 Miss Lockard said:  When we think about a stake.  What we

18 think is.

19     And in their Reply they cited *The Britannica Dictionary*

20 for what a stake is.  But as the Court saw from our opposition

21 brief, the Supreme Court and the Sixth Circuit have something

22 to say about what a stake is.  It's a term of art.  And those

23 cases that we cited, which the defense doesn't even try to

24 distinguish even today and they didn't mention a single case,

25 they make clear a stake has to be an unusual burden that is

1  placed on the prosecutor because the defendant elected to

2  exercise a protected right.

3      So an example would be that the defendant asked for a

4  trial *de novo* after being convicted in a lower court or the

5  defendant filed a Motion to Suppress that eviscerates the

6  government's case.  And for those examples you can look at the

7  Supreme Court's decision in *Blackledge*, and you can look at

8  the Sixth Circuit's decision in *LaDeau*.

9      But even something like a standard Motion to Suppress is

10  not just sufficient on its own.  It has to be an unusual

11  burden.  So we're talking about, like in *LaDeau,* a Motion to

12  Suppress that completely eviscerates the government's case,

13  forces the government to start over from square one.  And if

14  it's not that, it's what the *Suarez* Court called a "not

15  particularly exceptional" motion.  So your standard Motion to

16  Suppress, your standard motions *in limine,* those aren't enough

17  to raise the stake because those are so standard.  They happen

18  all the time.  There's no reason to think that the government

19  is going to act vindictively in response to them.

20      So the case law categorically rejects the idea that the

21  government has a stake in avoiding a trial because the

22  possibility of going to trial is an absolutely normal part of

23  every case.  It's not an unusual burden.

24      And, again, I point the Court to the very clear statements

25  going to this point in the Supreme Court's decision in

1　*Goodwin,* which is from the '70s, so it's been around for a

2　long time, I don't know how they missed it; in *Howell* from

3　2021, a Sixth Circuit case; in *Suarez;* and *DeJohn*. They all

4　make this point very clearly. The government has no stake in

5　the defendant's assertion of a right to trial.

6　　　Now, the second one that they allege, the alleged stake

7　was, quote from the Reply, "a specific punishment" --

8　　　THE COURT: I'm going to be really stupid here, but

9　isn't the argument that --

10　　Oh, never mind. Go ahead. Keep going.

11　　　MS. GARCIA: Thank you, Your Honor, but feel free to

12　interrupt me at any point.

13　　The second stake that they allege is "a specific

14　punishment (likely an upward variance) it could not otherwise

15　get," unquote. Now, first of all, I just want to point out

16　that our guidelines calculation is correct. And you can look

17　to the *Howell* case, that same one that addresses prosectorial

18　vindictiveness. The second section -- and I have a copy of it

19　here, if you'd like. It has a second section where the

20　defendant raises the argument: Hey, the District Court

21　calculated my guidelines wrong. You shouldn't have done the

22　cross-reference under 2K2.1 to the attempted first-degree

23　murder guideline.

24　　And the Sixth Circuit said, yes, you should have. They

25　affirmed the calculation of the District Court.

1      And the facts in that case were that the defendant

2   attempted to rob a bank.   The tellers were behind a door with

3   a small pane of glass.   He demanded that they open the door,

4   and when they didn't, he shot a single bullet to the window.

5   It got stopped by the bulletproof glass.   No one was hurt.   It

6   wasn't even clear that someone was directly behind there.   But

7   the Court felt that it was sufficient to show that he had shot

8   this bullet towards the window with the intent to hit one of

9   the tellers and get them to open the door.

10      And the Sixth Circuit said that's sufficient to find

11   first-degree murder.   And they specifically said if you point

12   your gun at someone and pull the trigger, that's enough to

13   find that there is intent to kill someone.   In this case, we

14   don't have a single shot shot through a window where someone

15   might have been in line.   We have nine bullets, and the victim

16   was hit and permanently disabled.

17      So the suggestion that this -- it would be ridiculous to

18   suggest that we'd even be able to get second-degree murder,

19   which is what we proposed in the Plea Agreement?   That's

20   preposterous.

21      Now, setting that aside, even assuming that our guidelines

22   calculation was wrong, they lose as a matter of law on this

23   alleged stake as well because -- first of all, I want to point

24   out, they don't cite a single case to suggest that the desire

25   to punish someone or to get a certain sentence could possibly

1    be a stake.  There is no case there.  I've done a lot of

2    looking.  Can't find it.  But you can just think about what

3    the case law said and what the particular standard is, and you

4    can see that that's not a stake, because it says it has to be

5    a stake in deterring the defendant from exercising a protected

6    right.  So they have to allege that the government did

7    something to stop Darias from exercising a right or to punish

8    him for having done so.

9        But they don't allege any protected right that our alleged

10   desire to punish him harshly was a response to.  So it's not

11   -- even if it were, you know, somehow a stake, it's not a

12   stake in a protected right and, therefore, doesn't qualify

13   under this term of art.

14           THE COURT:  What about the concept, though, of the

15   other two only get a deal if he cops out?

16           MS. GARCIA:  That is a group plea.  As we put in our

17   brief, every single Court of Appeal to look at this issue has

18   said there is no problem with a group or package deal like

19   that so long as you have probable cause to believe that the

20   other people are guilty of the crimes that they are being

21   charged with.  We do have that here.

22       And even if, you know, the defendants don't like the

23   particular offers that they got, the answer is to reject them,

24   which they did.  And I guess the bigger point, there still is

25   -- I don't -- it's not a stake.  It's not a stake in a

1　protected right.  So if they don't like the plea offer, but

2　they're still not saying what the -- you know, this plea offer

3　-- let's imagine, I guess, the plea offer is somehow a

4　response to something that Darias did?  They're not raising

5　anything that Darias did.  He didn't file any contested

6　motions.  He didn't do anything except for claimed his right

7　to go to trial, which the Court has said isn't sufficient.

8　　　So, just as matter of a law, it makes sense that they

9　haven't found any case law to support the idea that a plea

10　offer they don't like could somehow be vindictive.

11　　　But I guess the bigger point I'd redirect the Court to,

12　that case law that we cited from the Supreme Court -- so

13　*Bordenkircher* is the key one, and *Goodwin* is a key one on this

14　point.  *Bordenkircher* is the primary one.  It says there's

15　basically no such thing as vindictiveness in the context of

16　Plea Agreements and plea offers, and that's because the

17　defendant, A, doesn't have the right to a plea offer.

18　　　Obviously, Darias and all the defendants are free to plead

19　open at any time they want, throw themselves on the mercy of

20　the Court.  They can absolutely do that.  But the government

21　can offer them a plea offer, and the mere fact that they think

22　it's too harsh isn't sufficient to support a vindictiveness

23　claim.

24　　　Actually, the one case I believe they cite in their Reply

25　is the *Andrews* case from 1980.  And that's a good one to take

1    a look at, Your Honor, because in that case they said -- the

2    Sixth Circuit said that in *Bordenkircher* the Court held, the

3    Supreme Court held that actual vindictiveness on the part of

4    the government is okay in the plea context.  It's the one area

5    where actual vindictiveness is okay.

6       So, for example, it's totally fine to say to a defendant:

7    Right now you're charged with C-weight drugs, but if the lab

8    report comes back and it says it's pure meth, I'm going to go

9    ahead and supersede to A-weight.  So you really better plead

10    guilty right now before I get these results back.

11       And if those results come back and the guy rejects the

12    plea offer, it's not vindictive to make good on that promise.

13       The Supreme Court could not be clearer on that, and that

14    *Howell* case from the Sixth Circuit, 2021, same thing.  They

15    make that very clear in a footnote saying, you know, hey, in

16    this case there actually was no allegation that the government

17    was withholding charges as part of plea negotiations, but if

18    they had, that would have been totally fine.

19       So I think the biggest point on the group plea is there's

20    just no such a thing as vindictiveness in the context of plea

21    negotiation.  They can take it or they can leave it, and

22    that's the end of it.

23       Now, the third element, of course, is whether the

24    government acted unreasonably.  Because their claim fails as a

25    matter of law, we don't even reach this question, and we

1  shouldn't even talk about any of the facts of the case, but

2  for that reason -- our opposition could have been about two

3  pages long, and I want to explain why it was longer.  That is

4  because even though it fails as a matter of law, as a matter

5  of principle, the facts -- the facts were misrepresented so

6  egregiously in their motion that we felt obligated to set out

7  the correct statement of the facts just so the Court

8  understands that Miss Rossi and I were acting in good faith

9  throughout.

10      Now, those facts, at the end of the day we don't have to

11  get into them.  We just wanted the Court to know that we

12  worked really hard on this case and we did so ethically.  The

13  evidence that we got shows that these defendants are guilty

14  beyond a reasonable doubt.  You don't have to get there,

15  though, because those first two elements end the case.  They

16  lose.  It's over.

17          THE COURT:  Any follow-up, guys?

18          MS. LOCKARD:  Yes, Your Honor.  Thank you.

19          MR. CLARK:  Hey, Zenaida, when you're finished, I

20  want to add something maybe.

21          MS. LOCKARD:  Okay.

22      So, Your Honor, we included case law in our first motion

23  and in our second motion.  I think the reason that there isn't

24  case law that's directly on point is because these facts are

25  being presented for the first time.  Neither the government

1  nor the defense has been able to find facts that are analogous

2  to the facts that present to the Court, but the case law is

3  very clear that vindictive prosecution can occur in a pretrial

4  setting.  The case law is also very clear, and I'm quoting

5  from *LaDeau,* that the Court "must assess the fact situation

6  before it to see if the vindictiveness standard is met.  Each

7  situation will necessarily turn on its own facts."

8       So the reason that there's not a case directly on point is

9  because, put simply, these are the first time that these facts

10 have actually presented before a Court.

11      I would also note that we did look at the government's

12 cases which they cited to in their brief.

13      In *Goodwin*, the defendant there demanded a jury trial and

14 argued that the prosecution acted vindictively because they

15 wanted a bench trial.  That doesn't apply here.  Those facts

16 are not applicable here.

17      In *Howell*, that particular case dealt with a Superseding

18 Indictment on another count for the same defendant.  So you're

19 talking about someone who had a charge that was added later in

20 the prosecution, and the Court found that that was not

21 vindictive.  Interestingly in *Howell,* though, there was no

22 factual allegations that were made to support the defendant's

23 vindictive claim.  And, obviously, we have facts that support

24 what we're arguing and articulating to the Court here.

25           *LaDeau* and *Suarez* relate to the litigation of pretrial

1  motions, and those are obviously distinguishable because we're

2  not talking about litigating Motions to Suppress.

3      But put very simply, you know, the government, in their

4  particular response, has not accurately captured what we

5  articulated are the stakes that present before the Court

6  today.  And if the Court disagrees with our position that

7  these are legitimate claims, we don't disagree that the test

8  stops there.  But what we have articulated to the Court is

9  that the government has a vested interest, a stake, an

10 interest in the outcome of the case that exceeds what they are

11 required under the law to pursue.

12     We did cite to a Supreme Court case which the government

13 doesn't emphasize in their response today, *Berger versus The*

14 *United States,* that talks about the duties of the United

15 States Attorney.  It says, you know, in a criminal prosecution

16 the duties should not be that they should win a case but that

17 justice should be done.

18     So what we are articulating to the Court today is that the

19 government's interest is, number one, that they win and,

20 number two, that they have a sentence that they believe is the

21 appropriate sentence and may not be justified under the

22 guidelines.

23     You know, I think it's -- in their remarks today, it's

24 very telling that they are very confident that they could win

25 this particular guideline disagreement and that they believe

that they have -- they're saying -- I think she articulated -- Miss Garcia articulated they are very confident that their guidelines calculation is correct.  If that were the situation and they were not trying to guarantee that Mr. Jackson would be sentenced to 15 years, they would have simply accepted his counteroffer.  He offered at the *Lafler* hearing to plead guilty to every charge in the Indictment so long as the Court retained the authority to decide the appropriate sentence and so long as his counterparts received the same offers that they were otherwise being given.

I would also note that Miss Garcia articulated that our clients rejected the offer.  That is not what happened. Jessica and Greg both indicated that they would accept the offer as articulated in the global plea, but the government refused, because the only way that they were going to give our clients the benefits of those offers was if Mr. Jackson himself agreed to a sentence that may very well be double his guideline range.

So in addition to the government's own words, which is, again, that they are interested in seeking -- their "key objective is to hold Darias Jackson responsible for shooting the victim nine times and permanently disabling him" and they want "a guarantee of at least 15 years' imprisonment for Darias Jackson."  In addition to their own words, the manner in which they have pursued this case indicates exactly what we

1    are saying in our argument.

2        I do not disagree with Miss Garcia that we do not get to

3    the third step of the test, at least from their perspective at

4    this juncture.  We do have a burden to show, number one, that

5    there is a protected right that was exercised, which is

6    Mr. Jackson's right to trial; number two, that they have a

7    stake; and then, number three, that their conduct was somehow

8    unreasonable.  So at this point in the analysis, the Court is

9    to take the facts that we present and determine if those facts

10   support a finding that the government acted unreasonably.

11       What they have done in their explanation to demonstrate

12   how they acted reasonably is essentially gets to that

13   evidentiary hearing.  Under the case law, if we're getting to

14   a point where we're already discussing the facts and whether

15   or not they acted reasonably, then the case law is very clear

16   that we're entitled to an evidentiary hearing at that point in

17   time so that we can test their objective explanations on the

18   record.

19       And so for all of those reasons, Your Honor, we would

20   submit that we have met this initial test and ask the Court to

21   hold an evidentiary hearing.

22           MS. GARCIA:  Your Honor, may I respond briefly?

23           THE COURT:  Sure.

24           MS. GARCIA:  Miss Lockard claimed that there are no

25   cases directly on point and that's why they haven't cited any

1   cases in their brief that go to pretrial vindictiveness.

2   That's not true.  There are cases directly on point, and they

3   are the cases that we cited in our brief.  And I don't know --

4   I'm going to characterize it as just a misunderstanding of the

5   case law, but I'd like to just read you a few quotes from some

6   of the cases that we cited.  And I think if they really were

7   distinguishable, the defense would have distinguished them in

8   their Reply brief.  They didn't do that.

9       Here's a quote from the *Howell* case.  "Howell merely

10  asserted his right to a jury trial by pleading not guilty

11  roughly 15 months before Count 5 was added.  But a prosecutor

12  has no personal stake and thus no reason to engage in

13  self-vindication upon a defendant's request for a jury trial."

14      *Howell* doesn't distinguish between whether it was a bench

15  trial and whether it was a jury trial.  It just says there is

16  no stake in a trial.

17      *Suarez* says the same thing.  Quote, "Although the right to

18  a trial by a jury of one's peers is a highly protected right,

19  asserting this right by rejecting a plea bargain is not enough

20  to provide evidence of an improper motive on the part of the

21  prosecution."

22      Now also to the idea that it was somehow improper for the

23  government to make a plea offer, that was a (C) plea with a

24  binding sentence.  And it's somehow improper for the

25  government to want to punish Darias for shooting someone nine

1    times and nearly killing him and permanently disabling him and

2    then paying him $15,000 to lie about that to a Court, and

3    almost getting away with it, to suggest that that's improper

4    -- I want to make clear.  The Supreme Court has said that's

5    not improper.  That's our job, is to catch people doing bad

6    things and bring them to justice.

7        I'd like to quote the Supreme Court in *Goodwin*.  "The

8    imposition of punishment is the very purpose of virtually all

9    criminal proceedings.  The presence of a punitive motivation,

10   therefore, does not provide an adequate basis for

11   distinguishing governmental action that is fully justified as

12   a legitimate response to perceived criminal conduct from

13   government action that is an impermissible response to

14   noncriminal protected activity."

15       In this case, we made a (C) plea.  It happens all the

16   time.  They think the guidelines are different from ours?  We

17   felt very confident in our guidelines range.  And I think if

18   the Court takes a look at that *Howell* case, you will feel

19   confident in ours as well.  The offer we made is actually

20   below what the likely guidelines range is because it involved

21   the second-degree murder guideline and not the first-degree

22   murder guideline that was applied in *Howell*.  It's just a

23   normal (C) plea.  Darias didn't want it.  That's that.  Under

24   *Bordenkircher*, it can't support a vindictiveness claim.

25       At the end of the day, we don't get to any of the facts

1    about whether the government acted reasonably, because if you

2    take a look at all the cases we cite, it's clear:  two out of

3    the three elements, they can't even make a *prima facie* case.

4    It's over.  The motion loses.

5            THE COURT:  Anything else, guys?

6            MS. LOCKARD:  Your Honor, may I have just a moment to

7    confer?

8            THE COURT:  Yeah, sure.

9    (Defense counsel conferring.)

10           MR. CLARK:  Judge, just briefly in response to what

11    Miss Garcia said, she used some language that we haven't used

12    before, but I think it illustrates the point.  She said

13    "improper motive," and the improper motive here is very easy

14    to see in a snapshot of what Miss Garcia characterizes as a

15    routine Rule 11(c)(1)(C) plea.  It is not a routine (c)(1)(C)

16    plea.  It's tied to the consequences for two other defendants.

17    If there was no improper motive and all the prosecution was

18    doing was trying to do its job as prosecutors and punish

19    guilty individuals, there would have been no reason to reject

20    Darias's offer to plead guilty as charged to all counts as an

21    open plea and withhold, I'll say, the beneficial plea to the

22    other two co-defendants.

23       They didn't want to do that because that doesn't get them

24    the guaranteed higher sentence that, despite their bravado in

25    saying they believe their guideline calculation, if they did,

1  how much easier does it get then if he comes in and pleads

2  guilty to everything?  That is a snapshot of the entirety of

3  this vindictiveness issue.

4      Yes, 11(c)(1)(C) plea is routine.  Yes, you can have

5  Superseding Indictments in certain circumstances.  But the

6  circumstances that are here as a collective group so that the

7  government is trying to get a punishment they don't believe or

8  they don't suspect and they aren't willing to think is

9  sufficient enough unless Darias agrees to it.

10      And to punish two other individuals for that, I don't know

11  what else is improper and I don't know what else is

12  vindictive.  I think "vindictive" is an awkward word for this

13  type of concept that we're talking about, but I think what the

14  Court can keep in mind, and it's on pages 1 and 2 of the Reply

15  -- you don't have to find they acted in bad faith.  You can

16  look at it and determine that it's --

17      How did Judge Marbley describe it?  It's in the Reply.  I

18  won't waste the time.

19      But look at the snapshot of it.  You started early on in

20  saying:  Well, don't they just want a conviction?

21      No.  They want more as a punishment than the law they

22  believe would entitle them to.

23      We asked for a jury trial -- or waive a jury trial and

24  asked for a bench trial.  They weren't satisfied with that.

25  So a plea to all charges across-the-board guilty, that's not

1　sufficient for the government?  How much more justice do they

2　need than that?  I don't know what else is improper about

3　that.

4　　　Global pleas are proper, but not if they're done in bad

5　faith, not if they're done improperly.  If you look at the

6　facts that we have that -- I disagree with the government.

7　She cited cases but none that talk about a situation where an

8　11(c) plea is hung over the head of the others -- of one to

9　punish two others.  So there is no case law on this.  There's

10　nothing on point on this.  This is a unique set of facts, and

11　what both sides have tried to do is take case law and see

12　where it fits and where it doesn't.

13　　　But if you want a snapshot of it, think about how much

14　time Miss Garcia talked about the plea bargain, the advisory

15　guidelines, talks about the very purpose of it, and the

16　improper motive on the government's part to try to get Darias

17　Jackson, to force him to agree to take more time than he would

18　otherwise get.

19　　　And I will make a side note about some of the case law on

20　global pleas.  That case law warns trial courts to be extra

21　cautious in evaluating a global plea where family members are

22　involved.  I'm not going to try to distinguish the Court to

23　that.  I know you will look at it and see what it says.  But I

24　think when you look at everything you'll see that, at a

25　minimum, we may not win the motion at the end of the day, but

1    we certainly carried enough and established enough that we're

2    entitled to an evidentiary hearing.

3            MS. LOCKARD:  Your Honor, just to add to what

4    Mr. Clark indicated, at least in the context of Miss Brown and

5    Mr. Jackson's cases, if you look at the plea offers that were

6    extended to them, you know, one was a misdemeanor which my

7    client absolutely would not be able to get without the

8    government's concessions; and then in terms of Miss Kessler's

9    client, he was offered a felony plea but a guaranteed sentence

10   of probation or a recommendation of probation.

11       Alternatively, if they do not -- if Mr. Darias Jackson

12   does not accept the stipulated sentence of 15 years, then

13   Stephanie's client is now looking at an offer of 84 months,

14   and my client is looking at a felony with prison time as well.

15       Those particular sentences and those offers are not tied

16   to any of the factors under 3553(a).  The misdemeanor and the

17   guaranteed sentence of probation are specifically linked to

18   the set sentence of 15 years for Darias Jackson.  And if he

19   says no, then our clients are not entitled to those benefits,

20   and there isn't a basis under 3553(a) to support that.  The

21   only thing that supports that is what we have articulated to

22   the Court.  The government is interested in seeking a specific

23   sentence for Mr. Jackson, and absent that they are unwilling

24   to make these concessions for our clients.

25       As Mr. Clark indicated, while global pleas in a vacuum

1    have been condoned by Courts, there are several Courts, a lot

2    of them are in the Ninth Circuit, where they discuss the fact

3    that yes, if it is in a familial context you should be

4    particularly concerned about the possibility of coercion or

5    the involuntary nature of a plea.  In this particular case,

6    that's precisely what we have here.

7        I think if you take the government's actions one by one as

8    the government has done in its responsive pleading, perhaps on

9    their face you can say, okay, the defense has not articulated

10   a basis here or a legal claim.  But what we're arguing to the

11   Court is a cumulative or an overall picture of how they

12   engaged in conduct that runs afoul of their duties and that's

13   vindictive, and we've argued that in this particular context.

14       I would note what Mr. Clark was wanting to articulate is,

15   obviously, the Court doesn't have to find that they were

16   actually vindictive or that they had bad faith or bad

17   motivation.  The Court can simply find, based on our arguments

18   that we have articulated, a realistic likelihood of

19   vindictiveness.  And if we meet that standard, then we are

20   entitled to an evidentiary hearing where they can then present

21   all of their facts to support why they behaved reasonably.

22       In addition to that, there is one other step, which we

23   articulated in our Reply.  If the government is able to rebut

24   that presumption and they're able to show that they behaved

25   reasonably, well then we're able to test the facts to see if

1    that's actually pretextual.  We do have several concerns based

2    on the discovery that we have seen which we articulated when

3    we were talking about the discovery in this case.  You know,

4    of the 40 search warrants, there were a number of them where

5    it appears as though they are searching for Antonio Williams.

6    And so I think even if the Court was to find, you know, I'm

7    going to give you an evidentiary hearing and if we have an

8    evidentiary hearing the Court concludes the government behaved

9    reasonably, then we would still be able to test those facts to

10    see if it's just mere pretext.

11        For all of those reasons, we would ask the Court to grant

12    the evidentiary hearing.

13           THE COURT:  Stephanie, anything on behalf of your

14    client?

15           MS. KESSLER:  No, Your Honor.

16           THE COURT:  All right.  Well --

17           MS. GARCIA:  Your Honor, may I respond very briefly?

18           THE COURT:  No, because then they get to go again,

19    then you get to go again, and they get to go again.

20        I'll take it under advisement.  We're done.  Okay, thank

21    you.

22           MS. GARCIA:  Thank you, Your Honor.

23           MR. CLARK:  Thank you, Judge.

24           COURTROOM DEPUTY:  Court is adjourned.

25        (The proceedings concluded at 2:55 p.m.)

1          C E R T I F I C A T E

2

3      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6    /s/Maryann T. Maffia    June 15, 2023

7    Maryann T. Maffia, RDR
     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25