UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO.: 1:20-CR-074(1) |
| Plaintiff, | : | JUDGE BARRETT |
| v. | : | **UNITED STATES' SENTENCING MEMORANDUM** |
| DARIAS JACKSON, | : | |
| Defendant. | : | |

Darias Jackson ("Darias"[1]) was a convicted felon, and on supervised release for a federal drug-trafficking crime, when he tried to murder his friend A.W. in the parking lot outside an apartment complex at 3:00 a.m. Darias shot A.W. several times, including in the abdomen, and then drove away, leaving A.W. for dead.

Somehow A.W. survived, and from his hospital bed he identified Darias as the person who had shot him. But Darias didn't want to go to prison—so he bribed A.W. with an offer of $15,000 to recant, an offer A.W. took. A.W.'s false affidavit took care of the state charges against Darias, but there was still a federal investigation. So Darias withheld the final payment to A.W., pending the dismissal of the federal charges; and he tampered with another witness, instructing her to lie to the federal grand jury, which she did; and he attempted to tamper with a third witness, too, hoping that that witness would lie to Darias's federal probation officer.

Darias faces sentencing on three charges relating to tampering with witnesses and obstructing justice. He continues to deny that he shot A.W. But the evidence shows that he did—

---

[1] Darias Jackson's brother Greg is also a defendant in this case. To avoid confusion, the government refers to Darias Jackson as "Darias" in this memorandum.

1

and that he should serve a term of imprisonment of 180 months for his many crimes.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. On September 19, 2019, Darias shot at his friend A.W. nine times, striking him several times and necessitating life-saving surgery.

In the early morning hours of September 19, 2019, a witness began taking a video on his/her iPhone of an aggressive verbal confrontation between A.W. and a person who the evidence shows was Darias. In the video, Darias is wearing a white shirt and a red lanyard, and he is yelling aggressively at A.W. At times, he is also leaning against the hood of a black vehicle that, based on its shape and rear taillights (which are on), appears to be a Nissan Altima—the same make and model of vehicle that was then registered to Darias.

On the left is a zoomed-in screenshot from the video.[2] Although it is dark outside, Darias appears to be wearing a white shirt with a red lanyard. On the right is Darias's August 2019 driver's license photo, taken one month before the shooting; it shows him in a white t-shirt with what appears to be a red lanyard:

 

*Fig. 1: Screenshot from cellphone video*  *Fig. 2: Darias's Aug. 2019 driver's license photo*

The case agent from Darias's prior federal case watched the video and immediately identified

---

[2] The government will bring the video to the sentencing hearing for the Court to view if it wishes.

2

Darias as the person in the white t-shirt and the lanyard; he had surveilled Darias many times in connection with the prior case and opined that he was easy to recognize from the shape of his head.

Metadata shows that the video was taken at 3:06:31 a.m. and is one minute and fifty-two seconds long. It ends as A.W. starts walking away from Darias, back toward the apartment complex; Darias follows him, and then the video cuts off.

Because the video was one minute and fifty-two seconds long, it must have ended at approximately 3:08:23 a.m. The CAD report from the Cincinnati Police Department shows that, just thirty-four seconds later, at 3:08:57—that is, thirty-four seconds after Darias was seen walking after A.W., toward the apartment complex—a 911 caller reported that A.W. had been shot.

A.W. was rushed to the hospital, where he received life-saving emergency surgery. Officers later found nine 9mm casings at the scene, in the approximate location where Darias was last seen in the video. Compare the first set of screenshots below, which are from the last few seconds of the video, to the crime scene photos, which show where the casings were recovered. The red circle shows Darias's position in each frame, as he was walking between his car and one parked next to it:

 

*Fig. 3: Screenshot from video at 1:47*     *Fig. 4: Screenshot from video at 1:51*

3



*Figs. 5-6: Crime scene photos showing where casings were recovered*

About twenty minutes after the shooting, at 3:30 a.m., Darias's girlfriend, Jessica Brown, called him, and the two spoke for twenty-four seconds. Later that morning, Brown texted her work colleagues that she would need coverage for a shift because she "really ha[d] a family emergency" that she "ha[d] been going through [] since 330am"—suggesting that the call with Darias at 3:30 a.m. had been about Darias shooting A.W.

On October 2, 2019, while still at the hospital, A.W., during a double-blind photo lineup, said he was "100% sure" Darias—a longtime friend of his—was the person who had shot him.

**B. The state charged Darias with felonious assault and weapons under disability, and his federal probation officer alleged a violation of the terms of his supervised release.**

Later in October 2019, the Hamilton County Prosecutor's Office obtained an indictment against Darias, charging him with two counts of felonious assault with a firearm specification and one count of possessing a firearm under disability.

At the time of the shooting, Darias had been on federal supervised release in connection with his 2013 felony conviction for Conspiracy to Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana, for which he had been sentenced to 50 months' imprisonment. Case No. 1:12-CR-095-07. On October 4, 2019, Darias's federal probation officer filed a petition alleging that Darias had violated the terms of his supervised release by committing a state crime.

4

### C. From jail, Darias coordinated a witness-tampering scheme to thwart the state charges and the federal supervised release proceedings.

In or about October 2019, Darias, Brown, and Darias's two brothers, Gregory Jackson ("Greg") and J.I., devised a plan to bribe A.W. to recant his identification of Darias as the person who had shot him. Darias, from jail, and using other inmates' jail-call PINs, spoke with Greg, J.I., and Brown about their plot to pay A.W. $15,000 in exchange for A.W.'s recantation. Specifically, the conspirators planned to pay approximately half of the $15,000 to A.W. up front, with the second half of the payment to be made after the dismissal of all charges. Darias instructed Greg to make sure that "the handoff part"—i.e., giving A.W., who was still hospitalized, the first half of the cash bribe—took place in a "blind spot," meaning an area where the hospital's security cameras would not record it. Greg agreed.

On October 31, 2019, J.I. and a coconspirator arrived at A.W.'s hospital room with a typewritten affidavit recanting his identification of Darias as the shooter. After A.W. signed it in the presence of a hospital notary the conspirators had engaged, J.I. and the coconspirator took the affidavit and left. In exchange for signing the affidavit, they paid A.W. $7,000 in cash.

On December 19, 2019, Darias's then-state defense attorney filed a motion to dismiss the state charges and attached A.W.'s affidavit as an exhibit. On January 8, 2020, when A.W. did not appear for trial—despite being subpoenaed—the state charges against Darias were dismissed without prejudice.

### D. After the state charges were dismissed, Darias continued to obstruct the federal proceedings by telling Brown to tamper with his uncle Gary, to help hide evidence, and to lie to the grand jury.

After the state charges were dismissed, Darias was transferred to federal custody for supervised release proceedings. Meanwhile, the government continued to investigate Darias's role in the shooting—and he continued to try to obstruct that investigation from jail.

5

In a letter he wrote to Brown dated March 4, 2020, Darias instructed Brown to tell his uncle Gary to lie to the probation officer, especially about whether Darias had any phone numbers other than the one ending in -5587, writing in part:

> I forgot to say in the other letter is tell uncle gary don't say nothing about the store[.] In my P.O. eyes I just worked there I didn't tell him I had anything to do with it. [. . . ] Don't forget to make sure uncle gary say he pay me in cash the most being $630 for 2 weeks and the least being $380. Depending on the job [. . .] So basically I get paid every 2 weeks I did that the whole <u>August and September</u>. **The number 513-[XXX]-5587 that's the number he need to have if they ask him no other number**.

*See* Ex. A (underlining in original). For good measure, Darias also instructed Brown to avoid bringing his phones (which she had, and which the government was trying to find) to court, writing: "Make sure when you come to court don't have no Phone with you but yours." *See id.*

A few months later, Brown was subpoenaed to testify before the federal grand jury. On July 7, 2020, after she was served with the subpoena, but before her testimony, Darias spoke with her by phone, instructing her not to cooperate with the investigation, to say "I don't know" in response to any questions she did not feel comfortable answering, and not to answer the prosecutors' questions. Brown said she understood and agreed that she would tell the prosecutors she did not want to talk.

The next day, on July 8, 2020, Brown made several materially false statements to the grand jury, including that she did not know if Darias had a Facebook account, that she herself did not have a Facebook account, that she knew of no phone numbers for Darias other than 513-XXX-5587, that she had never seen Darias using a second phone, and that she had not met any brother of Darias's other than Greg. As Brown admitted in her plea agreement, she made these material misrepresentations with the intent of helping Darias, Greg, J.I., and herself avoid being prosecuted, including for the scheme to bribe A.W. Afterwards, Brown assured Darias that she had not had to "plead the Fifth" because "[the prosecutors] were asking stupid shit."

**E. Darias was indicted federally in July 2020, and a superseding indictment later added Brown as a codefendant.**

On or about July 22, 2020, a federal grand jury indicted Darias for possessing ammunition in violation of 18 U.S.C. § 922(g)(1). His supervised release violation remained pending.

A few months later, on October 21, 2020, a superseding indictment added charges against Darias and Brown relating to their conspiracy to lie to the grand jury.

**F. At around the same time, the conspirators continued to coordinate with A.W. about the bribe payments.**

The government discovered later, via a search warrant for Brown's phone, that on October 20, 2020, the day before the first superseding indictment was returned, A.W. had sent Brown a screenshot of messages in which he had asked Greg to "give [A.W.] da other half" of the bribery payment on Darias's next court date:



*Fig. 7: Screenshot of messages between A.W. and Greg, sent to Brown by A.W.*

7

A.W. complained to Brown, "I already did wat I was suppose to hit [sic] his charges dismissed," noting that "this fed shit"—the § 922(g)(1) charge—was new to him. A.W.'s messages showed that, contrary to the affidavit the conspirators had had him sign, he knew Darias was the shooter, but he somehow believed Darias had shot nine rounds at him by "accident":

> **A.W.:** . . . <u>I still a look out for bruh before he be doing a zillion years or a accident ….. but not if a mf tryna play me again</u> Jessica it don't make sense when. I can just be silent like I've been this whole time that [Darias's federal defense attorney] said that would help him doe a lot.
>
> **A.W.:** G told me I'll get str8 once I walk n the courtroom like that shit just sound like some perpin shit but the funny par is im willing to speak on cuz behalf
>
> **A.W.:** I'll go speak on his behalf on the strength fucc the money <u>I thought bruh was looking out on the strength of his mistake</u> Jessica I'm fucced up surgeries n shit allat …. <u>N fr dat was my mf brother bruh like this nothing never pose to cane between us</u> I know that nugga heart man he salt asf 2 tell em I still love em tf

A.W. then wrote that "G" (Greg) had asked him how much he was still owed, and he explained that he had been promised $15,000, with $7,000 already paid and $8,000 outstanding:

> **A.W.:** G ask how much I told em 8 jizzle already gave me 7 last year … I guess he ain't tryna do that for bruh or it just everything n me telling me like cuz tryna spend u like last time … I don't get it
>
> **BROWN:** Sheesh I ain't know anything about 8
>
> **A.W.:** 7 plus 8 that's 15 cuz coulda gave me close to that doe I'm tryna get my living shit together
>
> **A.W.:** It was 15 from jump doe
>
> **A.W.:** Half now half later was da agreement
>
> **A.W.:** Brought me 7 said it was 7500 but it was 7

Later, A.W. asked, "Why they ain't let him out when I sign that paper n got his charges dismissed[?]" Brown responded, "Feds picked up the case, on the other end it's all good."

8

### G. Darias eventually pleaded guilty to Counts 2, 3, and 6 of the Second Superseding Indictment.

On February 25, 2021, a federal grand jury returned a nine-count Second Superseding Indictment that added charges against Darias, Greg, and Brown relating to tampering with A.W.

On December 18, 2024, Darias pled guilty, pursuant to an Amended Plea Agreement (Doc. 207), to Counts Two, Three, and Six of the Second Superseding Indictment.

## II. LEGAL STANDARD

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Then, the Court is required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a). These factors include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) . . . the sentencing range established . . . [by the Guidelines];

9

> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the day of sentencing[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in section 3553(a)(2). *See* 18 U.S.C. § 3553(a).

### III. SENTENCING GUIDELINES CALCULATION

The United States agrees with the Guidelines calculations in the PSR, which give a Guidelines imprisonment range of 135 to 168 months based on a total offense level of 30 and criminal history category of IV.

The statutory maximum term of imprisonment is five years on Count 2, twenty years on Count 3, and twenty years on Count 6. (PSR ¶¶ 154-56.) The maximum term of supervised release is three years, and multiple terms of supervised release must run concurrently. (*Id.* ¶¶ 161, 163.) The maximum fine is $250,000 per count. (*Id.* ¶ 169.) Although restitution is applicable under 18 U.S.C. § 3663, there is no restitution in this case. (*Id.* ¶ 174.)

### IV. ANALYSIS OF THE § 3553(a) FACTORS AND SENTENCING RECOMMENDATION

The government recommends that the Court sentence Darias to the maximum term of imprisonment possible under the plea agreement: 180 months. There are several reasons why such a sentence is appropriate here.

First, the nature and circumstances of the offense could hardly weigh more strongly in favor of a 180-month sentence. Darias got in a fight with his friend at 3:00 a.m. and then shot at him nine times, hitting him repeatedly, including in the abdomen. Then Darias drove off, leaving

10

A.W. for dead. It is only thanks to the witness who drove A.W. to the hospital and the talented professionals at UC Medical Center that this was not a murder case.

A.W. was in the hospital for more than a month, and his medical records are more than 7,400 pages long. Images too graphic to file publicly show A.W.'s stomach with a gaping hole from the lower end of the sternum to nearly his private parts. *See* Ex. B (filed under seal).

The image below, from A.W.'s medical records, shows the locations of his many bullet wounds:



*Fig. 8: Diagram showing A.W.'s bullet wounds*

A.W.'s medical bills for just his initial hospitalization—i.e., not including his years of follow-up care—amounted to nearly $1.1 million, which was billed to American taxpayers via Medicaid. (*See* Ex. C.)

And things got worse from there. After he was arrested, Darias did not accept responsibility; nor did he resolve to fight the charges in court by putting the government to its proof. Instead, Darias, his brothers, and his girlfriend all conspired to undermine the justice system by paying A.W. to recant his identification of Darias as the shooter. And it worked, at

11

least at first: The false affidavit, which A.W. signed after being handed a bundle of cash, and A.W.'s later failure to appear when subpoenaed, led to the state charges being dismissed.

If Darias had not been on supervised release, he might have been home free. But because he was on supervised release, the federal government opened a grand jury investigation into a potential § 922(g)(1) charge. So, Darias instructed his uncle Gary, via Brown, to lie to his probation officer about whether he used any phones other than the one ending in -5587. And when the government called Brown to testify before the grand jury, Darias again attempted to undermine the justice system by instructing her to lie, which she did (including about the same issue of whether he had another phone).

It was only by obtaining more than forty search warrants and listening to hundreds of hours of jail calls—which Darias tried to hide by using other inmates' jail-call PINs, making them harder to find—that the government was able to piece together what had really happened and prove beyond a reasonable doubt both that Darias was the shooter and that he had tampered with A.W., Brown, and the grand jury process. The nature and circumstances of these offenses, therefore, weigh strongly in favor of a 180-month sentence.

The same is true of the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for it. Not only did Darias attempt to murder someone—placing his offense among the most serious possible—but his actions thereafter exhibited a complete lack of respect for the criminal justice system. Darias was willing to bribe a witness whom he had nearly killed, and to pull his girlfriend and brothers into the scheme; he was willing to submit false evidence in court and to convince A.W. not to comply with a trial subpoena; he was willing to tamper with his uncle Gary; and he was willing to mislead a federal grand jury. A sentence of 180 months would reflect the seriousness of these

offenses and send a message of deterrence to other defendants considering tampering with witnesses and submitting false evidence in an attempt to escape justice.

In addition to general deterrence, specific deterrence is important here. That is because, despite the evidence clearly showing that he was the shooter, Darias continues to falsely deny responsibility for shooting A.W.[3] To be sure, Darias was not entitled to an offense-level reduction for acceptance of responsibility due to his witness-tampering and obstruction-of-justice schemes—but had he taken responsibility, apologized, and resolved to do better upon his release from prison, that would have counted in his favor under the § 3553(a) factors. To the contrary, however, he continues to lie, giving more reason to think he presents a serious risk of recidivism.

Another factor suggesting that Darias presents a serious risk of recidivism is the fact that he was on federal supervised release when this offense occurred. He was a convicted felon and was just two years into his five-year term of supervised release when he not only possessed a firearm and ammunition but used them to try to murder someone. Then he continued to commit crimes by tampering with witnesses and obstructing the grand jury. His actions suggest he will continue to have difficulty abiding by the law upon his release.

Turning, finally, to Darias's history and characteristics, the government respectfully submits that they do not present substantial mitigating circumstances. Darias described having a close relationship with his mother, who worked as a television engineer, and with his brothers; he did not report being abused or mistreated as a child. He played sports in high school and graduated in 2005. Nothing in his background helps explain why he committed these crimes.

---

[3] Note, too, that because the plea agreement permitted Darias to plead guilty only to the witness-tampering and obstruction counts, his Guidelines range is significantly lower than it would have been had he also pled guilty to the felon-in-possession charge. Put another way, the Guidelines range reflects the seriousness of tampering with a witness in connection with an attempted murder—but it does not reflect the additional aggravating circumstance present here, which is that Darias was tampering with witnesses relating to an attempted murder he himself committed.

13

Taken together, the § 3553(a) factors show that a sentence of 180 months' imprisonment on each of Counts 3 and 6 and to 60 months' imprisonment on Count 2 (all to run concurrently), followed by three years of supervised release on each count (also to run concurrently), is sufficient but not greater than necessary to meet the goals of sentencing in this case. Darias attempted to commit a murder and then committed several more crimes to avoid facing justice for it. A sentence of 180 months in prison will reflect how serious these crimes were and, after all this time, provide just punishment for them.

V.     CONCLUSION

For the reasons given above, the government respectfully requests that the Court sentence Darias to 180 months' imprisonment on each of Counts 3 and 6 and to 60 months on Count 2 (concurrent), followed by three years of supervised release on each count (also concurrent), and $300 in special assessments.

Consistent with the plea agreement, the government further requests that Darias be sentenced to five years' imprisonment on his supervised release violations, but that this term of imprisonment run concurrently to the term of imprisonment in this case.

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*/s/ Julie D. Garcia*
JULIE D. GARCIA (CA 288624)
Assistant United States Attorney
United States Attorney's Office
221 E. Fourth St. Suite 400
Cincinnati, OH 45202
513-684-3711
Julie.Garcia@usdoj.gov